NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WACHTEL, et al., | : | |
| Plaintiffs, | : | Civil No. 01-4183(FSH) |
| v. | : | |
| GUARDIAN LIFE INS., et. al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| McCOY, | : | Civil No. 03-1801 (FSH) |
| Plaintiff, | : | |
| v. | : | |
| HEALTH NET, INC. et. al., | : | Date: June 18, 2007 |
| Defendants. | : | |

**OPINION**

**I. Introduction**

This matter is before the Court to determine whether or not the plaintiffs have set forth a prima facie showing that the defendants engaged in a crime or a fraud so as to satisfy "prong one" of the multi-step process for determining whether the defendants' claims of privilege in Log 15 should be pierced by the crime-fraud exception to the attorney-client privilege.

**II. Procedural Background**

On April 9, 2007, the Honorable Faith S. Hochberg's directed Special Master Wolin to submit a letter to Her Honor "with a proposal outlining an efficient method to narrow down

Defendants' February 12, 2007submission to this Court to those documents that are relevant for this Court's In Re Grand Jury analysis." Order dated April 9, 2007. Pursuant to the Order dated April 9, 2007, Special Master Wolin suggested that: (1) the Court first determine whether the plaintiffs have satisfied "prong one" by establishing a prima facie showing that triggers the application of the crime-fraud exception to Log 15; (2) if the Court finds the plaintiffs have satisfied "prong one," then he will conduct "a preliminary Stage II process involving the review of certain documents in accordance with procedures agreed to by the Parties"; and (3) after his preliminary review, he will report his findings to Judge Hochberg for Her Honor to determine how to proceed. Letter of Alfred M. Wolin, dated May 16, 2007 at 2-3. Judge Hochberg has adopted Special Master Wolin's proposal and has referred to this Court the resolution of whether the plaintiffs have satisfied "prong one" for triggering application of the crime-fraud exception to Log 15. The Court conducted a hearing on the record on this issue on June 7, 2007.[1]

### III. Discussion

For purposes of its "prong one" analysis, the Court applies the standard set forth by Judge Hochberg in Her Honor's May 5, 2006 Opinion. In that Opinion, Judge Hochberg stated:

---

[1]During the hearing, the Court granted the parties leave to file letters addressing the applicability of In Re Grand Jury. In their letter, the defendants contend that In Re Grand Jury requires the party seeking to pierce the privilege to make a prima facie showing that the party asserting the privilege intentionally used its attorney's advice to commit a crime or fraud. The defendants argue that Special Master Fleming's report establishes that they did not intentionally or deliberately destroy or fail to preserve evidence based on legal advice and thus the plaintiff have not carried their burden. See Letter of Robert White, dated June 12, 2007; see also Def. Br. filed December 15, 2006. In their letter, the plaintiffs contend merely their burden of making a prima facie showing is not particularly heavy at this stage and that In Re Grand Jury applies to any attorney-client advice that frustrates the proper administration of justice. Plaint. Br. dated June 12, 2007. For the reasons set forth herein, the Court finds that the limited findings of Special Master Fleming do not dispel the prima facie showing sufficient to warrant the Stage II proceeding.

The attorney-client privilege protects communications between an attorney and his/her client made in confidence for the purpose of obtaining legal advice. Because the privilege has its costs, it is not absolute. See United States v. Zolin, 491 U.S. 554, 562 (1989) ("Since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose.") (citations omitted); see also United States v. Doe, 429 F.3d 450, 453 (3d Cir. 2005) ("Because this ancient and valuable privilege is at the expense of the full discovery of the truth, it should be strictly construed.").

The crime-fraud exception allows for disclosure of otherwise privileged communications when they are made with the intent to further a continuing or future crime or a fraud. See Doe, 429 F.3d at 454.[2] The purpose of the crime-fraud exception is "to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." Zolin, 491 U.S. at 562 (citations omitted).

The Third Circuit has established a multi-step process for determining whether a party's claim of privilege should be pierced by the crime-fraud exception. First, in order to invoke the exception, the party seeking discovery must make a prima facie showing that (1) the client claiming the privilege was engaging or intended to engage in a crime or fraud at the time of the attorney-client communication, and (2) that the communication was in furtherance of the continuing or intended crime or fraud. See In re Grand Jury Subpoena, 223 F.3d 213 (3d Cir. 2000); see also In Re: Grand Jury Investigation, No. 06-1474 (3d Cir. Apr. 21, 2006) (explaining that a client's misuse of communications with her attorney in furtherance of an improper purpose is sufficient to satisfy the second prong of the crime-fraud exception). The prima facie showing requires that the party seeking discovery "present evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception

---

[2] The crime-fraud exception also applies to attorney work product, which "loses its protected status if it relates to efforts to facilitate a crime or fraud, or to conceal illegal conduct, obstruct justice, or subvert the legal system." See Gutter v. E.I. Dupont De Nemours, 124 F. Supp. 2d 1291, 1294 n. 2 (S.D. Fla. 2000); see also In re Grand Jury Proceedings (FMC Corp.), 604 F.2d 798, 802-03 (3d Cir. 1979).

3

> were met." Haines v. Liggett Group, Inc., 975 F.2d 81, 95-96 (3d Cir. 1992); see also Zolin, 491 U.S. at 572 ("Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.") (citations and quotations omitted).
>
> This evidentiary showing, which is required before the Court may conduct an *in camera* review of the contested documents, is a lesser standard than that which is ultimately required for disclosure under the crime-fraud exception. Zolin, 491 U.S. at 572 (holding that a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege); In Re: Grand Jury Investigation, No. 06-1474 at 13 (describing as not particularly heavy the burden to make the necessary prima facie showing for the crime-fraud exception); Haines, 975 F.2d at 96 (noting that "the decision to engage in *in camera* review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal") (citations omitted). Where this Court uses the term "prima facie showing" in this opinion, it is referring to the standard set forth by the Third Circuit, which requires a factual basis "to support a good faith belief by a reasonable person that the materials may reveal evidence of a crime or fraud." See Haines, 975 F.2d at 96.

Opinion, dated May 5, 2006 at 2-4. Moreover, Judge Hochberg stated, "[t]he crime-fraud exception is not limited to evidence that supports a finding of common-law fraud. Rather, under federal law, the exception can encompass communications and attorney work product 'in furtherance of an intentional tort that undermines the adversary system itself.' See Madanes v. Madanes, 199 F.R.D. 135, 149 (S.D.N.Y. 2001); see also In re Sealed Case, 676 F.2d 793, 812 (D.C. Cir. 1982). This may include communications and work product used in furtherance of the spoliation of evidence. Rambus, Inc. v. Infineon Tech. AG, 220 F.R.D. 264, 283 (E.D. Va. 2004)." Opinion, dated May 5, 2006 at 5-6

4

With this standard in mind and having considered the parties' arguments and the record of proceedings, at this preliminary stage, the Court finds that the plaintiff have made a prima facie showing that the crime-fraud exception to the attorney-client privilege may apply with respect to the documents identified in Log 15. Indeed, Judge Hochberg has already specifically found that

> the evidence presented [in this case] sets forth a prima facie showing sufficient to warrant *in camera* review of Defendants' allegedly privileged documents in the subject matter areas set forth below.
>
> By way of example, the court finds sufficient evidence in the record to suggest that the Health Net Defendants made misleading representations, by omission, to agents of the New Jersey Department of Banking and Insurance ("NJDOBI") about the extent of the company's use of improper data to calculate its beneficiaries' out-of-network benefits. In late 2002 and early 2003, Health Net negotiated with NJDOBI to reimburse beneficiaries for its use of outdated HIAA data to calculate the usual customary rate ("UCR") for out-of-network medical procedures. Throughout this period of negotiations, leading up to a signed Consent Order in December 2002, corporate officials within Health Net, including the Chief Financial Officer of Health Net of the Northeast ("HNNE"), knew that the company's use of outdated data began two years before July 2001. Yet top Health Net officials did not disclose this to NJDOBI and conducted the negotiations through representations solely about the use of outdated data beginning in July 2001, which led to a Consent Order limited to the post-July 2001 time period.
>
> Health Net representatives, including plan counsel Eileen O'Donnell, Esq., and her boss, HNNE General Counsel Paul Dominianni, Esq., did not disclose the company's practice of using outdated data as early as1999, thereby avoiding the obligation to reimburse Health Net beneficiaries hundreds of thousands of dollars. While Ms. O'Donnell testified that she personally did not know that the practice began in 1999, other more senior corporate officials, including the Chief Financial Officer of the Northeast Division, had knowledge that: (1) the use of outdated data in

reimbursements to beneficiaries began at least as early as 1999; and (2) that Health Net did not so represent to the state agency, instead limiting Health Net's disclosure to the period after July 1, 2001. This omission of facts rendered the stated facts misleading. Plaintiffs have set forth enough to make out a prima facie showing that Health Net may thus have been utilizing the services of its counsel to engage in a crime or fraud at the time of the communications with NJDOBI.

The court also finds sufficient evidence to support a prima facie showing that the Health Net Defendants may have obstructed justice in connection with its dealings with NJDOBI. Evidence adduced constitutes a prima facie showing that, when hearings began in federal court as to whether certain preliminary relief should issue, Health Net, through its counsel, may have misrepresented in Court papers the existence and progress of a purported agreement between Health Net and NJDOBI to reimburse beneficiaries' overpayments resulting from Health Net's use of outdated data between January 1, 1999 and June 30, 2001.

This claimed agreement between Health Net and NJDOBI to make restitution for the earlier period, from January 1, 1999 to June 30, 2001, has been colloquially referred to as the "Second Restitution," even though it refers to an earlier time period than the "First Restitution." It was claimed by Health Net, through counsel at the preliminary injunction hearing on November 20, 2003, that Paul Dominianni, Esq., Chief Plan Counsel for HNNE, and Lee Barry, Assistant Commissioner of NJDOBI reached an agreement to make a "Second Restitution." Individuals within Health Net, including Mr. Dominianni, knew well prior to November 2003 that a Second Restitution to beneficiaries and disclosure to NJDOBI were imperative, but it was not until the very date of this Court's preliminary injunction hearing on November 20, 2003, that Mr. Dominianni finally spoke with Mr. Barry. The phones connected for about seven minutes. What was said during that short call is disputed. Both sides agree that the call involved pleasantries about Mr. Barry's planned day off and a meeting to which he was running. Mr. Dominianni testified that he told Mr. Barry that Health Net had "a problem" from January 1, 1999 to July 2001; that the company intended to resolve it; that Mr. Barry concurred; and that an agreement to make the "Second Restitution" was formed. Mr. Barry contends that nothing substantive was discussed about any further restitution and that no agreement of

6

any kind was made in the short phone call. No confirming e-mail, letter, or draft agreement was ever sent by Mr. Dominianni to Mr. Barry. Mr. Dominianni testified that, "at the time [he] thought there was some chance that Mr. Barry may follow up and some chance that he may not." 10/17/05 Transcript at 155, ln. 2-3. Mr. Dominianni never followed up with Mr. Barry to memorialize any agreement. Id. at 155, ln. 7-9.

The short conversation between Mr Dominianni and Mr. Barry took place about an hour or two before this Court convened its first evidentiary hearing, where the Court would consider whether injunctive relief was necessary to protect Health Net beneficiaries. At the hearing on November 20, 2003, Health Net's counsel, John Pendleton, Jr., Esq., of McCarter & English, assured the Court that no injunctive relief was necessary because "Health Net has since gone back to the New Jersey department, and there may be either an amendment to the consent order, or a separate – there is no investigation. We made disclosure that there are – we've discovered that in 1999 we hadn't paid, and so we're going to rectify that, that's about a $528,000 restitution program that we'll make to small group people in New Jersey." 11/20/03 Transcript at 30, ln. 4-10. Health Net plan counsel, Eileen O'Donnell, Esq., testified on that date that "we have gone back to the department [NJDOBI] to say that we have uncovered other errors and that we would propose, and they accepted our plan of remediation." Id. at 149, ln. 13-16.

During the year following the November 20, 2003 hearing, Mr. Pendleton repeated several times in briefs and letters that the Second Restitution was "in the process" of being carried out. However, there is no evidence, during the entire year after the November 20, 2003 hearing, that any "process" for carrying out the Second Restitution had ever begun.

On December 17, 2004, Magistrate Judge Shwartz issued an order demanding an explanation. Mr. Dominianni thereupon began a frantic effort to make it appear that the Second Restitution had been underway. As part of these efforts, Mr. Dominianni (through McCarter & English, Esqs.) submitted an affidavit on January 4, 2005, blaming the failure to accomplish the Second Restitution on the many steps needed to complete the task and on "inadequate continuity of work flow and personnel." The affidavit failed to mention that no work had been done to commence the

restitution until the Magistrate Judge demanded an explanation and that by the date of the affidavit, Paul Dominianni, Esq., knew that the "work," i.e. the calculations for the Second Restitution, had already been done 2 years earlier.

This Court finds sufficient evidence to establish a prima facie showing that Mr. Dominianni and Health Net never intended to make a genuine agreement with NJDOBI to make a Second Restitution nor to carry it out, had the Magistrate Judge not blown the whistle. Disclosure that Health Net had begun to use outdated data two years earlier than the time period disclosed during the negotiations leading to the "First Restitution" would have notified NJDOBI that its initial Consent Order with Health Net, in December 2002, was based on misleading statements. Such a realization would likely have caused officials at NJDOBI to open a more searching investigation into Health Net's beneficiary reimbursement practices and, in particular, into its use of outdated data. The claimed agreement for a "Second Restitution," if fully disclosed to NJDOBI, could cause administrative repercussions because it would have revealed the misleading statements made in connection with the "First Restitution." Thus, the evidence presented is adequate to support a prima facie showing that *in camera* review of privileged documents in this case could reveal that Health Net used its counsel to obstruct justice in connection with NJDOBI.

The Court also finds sufficient evidence that the Health Net Defendants may have used their counsel to delay discovery. Throughout discovery, Plaintiffs expressed concerns to Magistrate Judge Shwartz that the Health Net Defendants were not taking all appropriate steps to preserve and produce relevant documents. In response to these concerns, Health Net's counsel, John Pendleton, Jr., stated in a May 8, 2003 letter to Magistrate Judge Shwartz that "we are familiar with our obligations" and that the company "has complied with its obligations to preserve evidence." Despite these assurances, there has been a prima facie showing that Health Net did not have effective procedures in place to ensure the preservation of employees' electronic mail. An associate at McCarter and English stated that she was not made aware by the client (Health Net) of its electronic document procedures.

Judge Shwartz issued many discovery orders that should have unearthed hundreds or perhaps thousands of e-mails from

Defendants' files during the discovery period. However, it was not until late 2005, when this Court commenced a Rule 37 / Integrity hearing into alleged discovery abuses and misrepresentations to the Court, that most of those e-mails first began to emerge, years after they should have been produced in discovery. For the duration of years of discovery, and even throughout the Integrity Hearing itself, Health Net counsel did not disclose what this Court and Magistrate Judge Shwartz learned for the first time <u>after</u> the Integrity Hearing — that Health Net e-mails were sent to backup disks after 90 days from the date of creation; that these disks were never searched for responsive documents during the three year period of discovery; and that when any employees deleted e-mails within 30 days, such e-mails would be lost permanently upon transfer to storage at 90 days. Moreover, even when a central witness in the case (Eileen O'Donnell, Esq.) retained e-mails by overriding this system, Health Net counsel gave conflicting accounts of whether she was asked to do a search of those e-mails for relevant documents. Ms. O'Donnell testified that she was never asked to do and she never did a comprehensive e-mail search. 03/09/06 Transcript at 157, ln. 12-13. Outside counsel testified that Ms. O'Donnell claimed she turned over all the e-mails that existed on the "HIAA issue," which consisted of a few e-mails between Ms. O'Donnell and Lee Barry. 01/05/06 Transcript at 232, ln. 5-10, 18-25; 03/01/06 Transcript at 19, ln. 8-14. Inside counsel testified Ms. O'Donnell was aware of the document requests in this case and aware of the need to look through her e-mail files to produce all responsive e-mails, so to the extent that she elected not to search her own e-mails, inside counsel did not get those e-mails from Ms. O'Donnell. 01/05/06 Transcript at 72, ln. 1-13. Three counsel; three statements; no serious e-mail search.

Despite repeated queries by this Court as to why so many highly relevant e-mails had never been timely produced, not one member of Health Net's legal team informed the court about the non-preservation risk and non-search of e-mails older than 90 days until after the conclusion of the Rule 37/Integrity hearing. By this time, it was too late to query Health Net witnesses about their searches for documents. Health Net's newest outside counsel, Morgan Lewis and Bockius, submitted a lengthy certification on December 12, 2005, in response to the Court's questions about whether, when and how certain specified Health Net employees made a reasonable, thorough and diligent search of their files for responsive documents. The December 12, 2005 certification did

not state that HNNE employees' e-mails went to a backup tape after 90 days, and thus could not be searched by the employees themselves, nor that the backup tapes were not searched by Health Net. Counsel at Morgan, Lewis and Bockius LLP stated that he also did not know of this Health Net electronic document policy, see 03/09/06 Transcript at 22, ln. 13-17, but Health Net's other outside counsel at Epstein Becker & Green P.C., Herve Gouraige, Esq., did know about the extent of email searches or lack thereof, see Certification of Barry M. Kazan.

In sum, Health Net disclosed to one of three outside firms (Epstein Becker and Green, P.C.) its e-mail policies; no counsel informed either Magistrate Judge Shwartz or this Court until after the conclusion of the Rule 37/Integrity hearing; and Health Net only searched four of its scores of pertinent employees' backup tapes, for limited periods of time, in order to locate responsive e-mails. The most relevant e-mails in the case were produced from a one-month search of backup tapes belonging to a single employee, which were searched only after the Court at the Integrity Hearing demanded to know the origin of a specific document.

These facts are sufficient to support a prima facie showing that *in camera* review of the materials may reveal evidence to establish that the crime-fraud exception applies to certain allegedly privileged documents.

Opinion & Order, dated May 5, 2006, at 6-12.[3]

---

[3]Similarly, in the Opinion dated April 10, 2007, Judge Hochberg stated that

Health Net never informed the Court during the four year discovery period that they used an e-mail system that automatically sent e-mails to back-up disks every 90 days. Health Net concealed that no search of these tapes was ever made. Defendants had been under Court orders for years to produce certain relevant e-mails of its employees. During the preceding four years of litigation leading up to this Court's discovery of this practice at the end of the Rule 37 Hearing, Defendants never told the Magistrate Judge, this Court, or even their outside counsel this crucial fact and instead insisted that all e-mail was being searched. Therefore, Defendants never searched the relevant e-mails during discovery. Furthermore, any e-mails that an employee deleted within 30 days of receipt were lost permanently upon transfer to storage. Because litigation

10

Moreover, in Her Honor's Opinion dated December 6, 2006, Judge Hochberg found that

> Health Net's lack of candor to this Court and to Magistrate Judge Shwartz concerning its NJ-DOBI restitutions includes: (1) asserting in its answers to interrogatories, affidavits, briefs, pleadings, and motions that it was in "strict compliance" with all New Jersey regulations without disclosing the existence of a NJ-DOBI investigation into its violation of New Jersey regulations; (2) violating Magistrate Judge Shwartz's July 23, 2003 Order by failing to disclose until the day of this Court's November 20, 2003 Preliminary Injunction hearing that Health Net's use of outdated data in calculating UCR extended back to 1999 (rather than mid-2001 as had been represented to NJ-DOBI); (3) falsely representing to this Court at the Preliminary Injunction hearing, in order to avoid the imposition of injunctive relief, that it had reached a "Second Restitution" with NJ-DOBI based upon nothing more than a vague seven minute phone call between General Counsel of HNNE Paul Dominianni, Esq. and NJ-DOBI that took place a mere hour before the court hearing, which did not in fact reach an agreement for a Second Restitution; (4) failing to proceed to pay the promised Second Restitution despite repeated representations to the Court that the Second Restitution was in progress; and (5) submitting a false and misleading certification from Paul

---

> is nearly always a search for historic documents over 90 days old by the time they are demanded and ordered by a court to be produced, this undisclosed e-mail system effectively meant that no germane e-mails were searched and spoliation occurred. Yet, Health Net repeatedly told the Magistrate Judge that all relevant e-mails were being produced. *See generally* this Court's December 6, 2006 Opinion at 18-33. Because Defendants did not tell their counsel during discovery of the e-mail retention practices and did not candidly disclose these issues to the Magistrate Judge, an appropriate order was not sought by Defendants' counsel nor could one be tailored to deal with any allocation of burden or to keep costs down. *See, e.g., Zubulake v. UBS Warbug LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003). The Court's May 5, 2006 Order directed Defendants to restore e-mail back-up tapes, review e-mails, and produce e-mails of initially 59 individuals—a discovery obligation Defendants had been subject to for years.

Opinion, dated April 10, 2007, at 7-8 n.7.

11

Dominianni, Esq. to Magistrate Judge Shwartz, in response to her December 17, 2004 Order, that blamed the failure to accomplish the Second Restitution on the many steps needed to complete the task and on "inadequate continuity of work flow and personnel" without mentioning that, in fact, no steps had been taken to commence such restitution prior to Magistrate Judge Shwartz's Order and omitting to state that the calculations had already been made two years earlier.  The number of instances and the extent of Health Net's lack of candor concerning its restitutions to NJ-DOBI, described in more detail below, will not be tolerated and justify sanctions against Health Net.  Health Net has been represented by three separate law firms at various stages of this case, and the pervasive misconduct, as more fully described below, was consistent throughout all stages.  From the lengthy pattern of misconduct, the Court concludes that Health Net, through its own in-house counsel and top executives, was responsible for many of the egregious actions in this case.

***

The Health Net Defendants have violated the integrity of this Court's judicial processes by:  (1) ignoring adverse orders of Magistrate Judge Shwartz and acting as if their burdensomeness objections had been granted when they had been briefed, considered, and rejected by the Magistrate Judge; (2) disingenuously claiming that they could not understand clear orders of the Magistrate Judge; (3) submitting false and misleading statements in court papers, affidavits, and testimony at the Preliminary Injunction hearing in an effort to make it appear that an agreement with NJ-DOBI had been negotiated regarding a "Second Restitution" when no such agreement existed; (4) stating at the Court hearing that the 1999-2001 use of outdated data was "just discovered" before the Court's Preliminary Injunction hearing, when in fact Health Net's CFO and executives had known for a long time that the outdated data had been used far earlier than July 2001; (5) submitting a false affidavit by Health Net's CFO Hamilton; (6) submitting a false affidavit by HNNE General Counsel Dominianni in response to the Magistrate Judge's demand for an explanation as to why the "Second Restitution" repeatedly described to the Court as "in progress" had in fact never even been commenced; (7) failing to disclose to this court or to the Magistrate Judge during three years of discovery that e-mails older than 90 days were never searched when proper discovery requests sought

> historic information from a period more than 90 days earlier; (8) permitting spoliation of electronic discovery by allowing employee deleted e-mails to be purged and lost, when e-mails were automatically sent to back-up tapes after 90 days, while at the same time having outside counsel inform the Magistrate Judge that a document preservation order was not needed because Health Net knew its obligations to preserve documents as evidence; (9) failing to disclose and avoiding production of damaging documents that would have shown to Plaintiffs that Health Net management knew that the use of outdated data was wrong and done to increase profits; and (10) keeping even their own outside counsel (other than the Epstein Becker firm) unaware of their e-mail procedures that resulted in widespread dereliction of their discovery obligations.

Opinion, dated December 6, 2006 at 7-8, 38-39. Relatedly, Judge Hochberg explicitly found that "Health Net <u>willfully</u> chose not to disclose the existence of thousands of responsive documents and not to disclose their electronic document system." <u>Id.</u> at 24 (emphasis added).

Thus, Judge Hochberg specifically examined the defendants' conduct in this case and Her Honor has found that the plaintiffs have established a <u>prima facie</u> showing of the applicability of the crime-fraud exception in three areas: (1) the First Restitution; (2) the Second Restitution; and (3) discovery. Nothing was presented at the June 7, 2007 hearing to warrant revisiting any of Her Honor's findings and hence there is no reason why these findings should not support a review of the documents listed in Log 15.

Although the defendants point to Special Master Flemings's May 31, 2007 report as a basis to reject the Court's <u>prima facie</u> finding regarding the defendants' discovery conduct, the Court finds that this report is an insufficient basis upon which to find that the plaintiffs have not made the <u>prima facie</u> showing. First, although Special Master Fleming states "there was no evidence of intentional, malicious or bad faith conduct," Letter of Cathy Fleming, dated May 31, 2007 at 9, the Special Master's factual findings were limited to whether or not there was a

13

deliberate destruction of emails for the 59 custodians she reviewed, id. at 6, 9, and her report does not cover the breadth of conduct from which Judge Hochberg found a prima facie case exists.  Second, Special Master Fleming was charged with insuring that the defendants "have complied with the discovery orders identified in the Rule 37 Opinions and the Court's May 5, 2006 Opinion, with priority to insure compliance with the May 5, 2006 opinion."  Id. at 2.  As such, she was not charged with looking into the defendants discovery-related conduct throughout the pendency of this action but rather her focus was limited.  Third, Special Master Fleming made no findings regarding the First and Second Restitutions.

Accordingly, the Court need look no further than Judge Hochberg's prior Opinions and findings to conclude that the plaintiffs have satisfied their burden of making a prima facie showing under the first prong of the test for the crime-fraud exception with respect to the documents identified on Log 15.

## IV.  Conclusion

For all of the reasons set forth herein, the Court finds that the plaintiffs have made a prima facie showing so as to satisfy "prong one" of the multi-step process for determining whether the defendants' claims of privilege in Log 15 should be pierced by the crime-fraud exception to the attorney-client privilege.  As such, the parties are directed to contact Special Master Wolin to coordinate completion of a Stage II hearing, as set forth on pages 2-3 of Special Master Wolin's May 16, 2007 letter.  An Order consistent with this Opinion will be entered.


                                                s/Patty Shwartz
                                                UNITED STATES MAGISTRATE JUDGE